IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PALESTINE, TEXAS; AND COUNTY OF ANDERSON, TEXAS,<br><br>Defendants. | Civil Action No. 6:19-cv-00574<br><br>**COMPLAINT** |

## INTRODUCTION

1.  For nearly two centuries, railroads have played a leading and essential role in the transportation of people and goods across the United States. Because of the inherently interstate nature of this critical means of transportation, Congress has sought to prevent piecemeal regulation of rail transportation by the States.

2.  The present national regulatory structure was established in 1995, when the ICC Termination Act (ICCTA) replaced the old Interstate Commerce Commission (ICC) with a new federal agency—the Surface Transportation Board (STB)—and vested it with "exclusive" jurisdiction over rail transportation within the United States. 49 U.S.C. § 10501(b). The STB has exclusive authority over the "rules ..., practices, routes, services and facilities" of rail carriers, including the "operation, abandonment, or discontinuance" of railroad "facilities," even when the railroad is located entirely in one State. *Id.* Congress further provided that the federal remedies provided by ICCTA "with respect to the regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." *Id.* §10501(b)(2). As the Fifth Circuit

1

has recognized, Congress's mandate for a uniform national system of rules and regulations for railroads broadly preempts any state requirements that "have the effect of managing or governing rail transportation," including even generally applicable law not directed at railroads if it has "the effect of unreasonably burdening or interfering with rail transportation." *Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, 593 F.3d 404, 414 (5th Cir. 2010) (en banc) (citation omitted).

3. This case involves an attempt by a city and county in the State of Texas to continue to regulate the business and operations of Union Pacific Railroad Company (Union Pacific) based on a state law obligation that originated in the 19th century. At that time, railroads and localities occasionally entered into "shop agreements" under which railroads would promise to support local employment and tax revenue by maintaining certain operations or facilities in particular locations, in exchange for local bond issuances. Virtually all of those shop agreements were declared invalid over the course of the 20th century because of the burdens the localized agreements imposed on efficient interstate rail operations and because of the importance of consistent and uniform national regulation of railroads.

4. The shop agreement at issue here was originally made in 1872 between the City of Palestine (Palestine) and Anderson County, Texas, and a distant corporate predecessor of Union Pacific. The shop agreement originally became unenforceable more than a century ago because of the predecessor railroad's insolvency and reorganization. However, the shop agreement was preserved first by a Texas statute mandating that successor railroads must comply with shop agreements made by their predecessors and then by a 1914 Judgment enforcing that statutory obligation against the then-International & Great Northern Railroad Co. (I&GN). The I&GN later became a part of the Missouri Pacific Railroad Company (Missouri Pacific), which many years later merged into the Union Pacific.

5. As a result, Union Pacific's obligations to Palestine and Anderson County currently are embodied in a 1954 Agreement that the Missouri Pacific negotiated as part of a two-decades long bankruptcy proceeding. At that time, federal bankruptcy law, much like the earlier Texas statute, made obligations originating in shop agreements non-dischargeable. Palestine and Anderson County now maintain that the shop agreement in its present form requires Union Pacific to maintain a substantial workforce in Palestine *forever*—no matter whether that requirement meets the railroads' modern rail transportation needs or how much more efficient it would be if Union Pacific were to restructure the work performed by some or all of those positions or to move them to different locations on its interstate system.

6. In the early 1970s, Missouri Pacific sought permission from the ICC to merge with its principal subsidiaries and as part of that process asked the ICC to declare the 1954 Agreement invalid. The ICC agreed that the shop agreement "currently impose[s] undue burdens and obligations on [the railroad], and that [it] will impose burdensome, inefficient, injuriously wasteful, and unnecessary obligations on [the railroad's] operations and upon interstate commerce," and declared it invalid and unenforceable. *See Mo. Pac. Ry. Co.*, 348 I.C.C. 414, 430 (1974). The Fifth Circuit subsequently vacated that finding without reaching the merits, holding only that the ICC's statutory authority to invalidate state-law obligations where necessary "to enable [carriers] to carry into effect" a merger transaction "approved by the Commission," 49 U.S.C. § 5(11) (1970), did not extend to a shop agreement that unreasonably burdened interstate commerce but did not, in itself, make the merger impossible. *See City of Palestine v. United States*, 559 F.2d 408, 414 (5th Cir. 1977).

7. The then-existing statutory limitation on the old ICC's authority that caused the Fifth Circuit to vacate the ICC's decision in *City of Palestine* is no longer controlling. Under

3

ICCTA, preemption of state attempts to regulate rail transportation under state law and of state laws that unreasonably burden rail transportation is self-executing and requires no further action by the STB. *See* 49 U.S.C. §10501(b)(2). The ICC's 1974 decision nonetheless remains a powerful explanation of the reasons why the shop agreement then and now imposes "burdensome, inefficient, injuriously wasteful, and unnecessary obligations" on railroad operations and interstate commerce. 348 I.C.C. at 340. By mandating that Union Pacific must continue to employ a substantial workforce in a particular locality in a manner that interferes with the efficient operation of its interstate railroad, the shop agreement on its face has "the effect of managing or governing rail transportation," and, as applied, "the effect of unreasonably burdening or interfering with rail transportation." *Franks*, 593 F.3d at 410, 413. These effects render the shop agreement impermissible under ICCTA's broad preemption clause. 49 U.S.C. §10501(b)(2).

8.   Union Pacific does not file this suit lightly. Union Pacific has long been a part of the Palestine and Anderson County communities and has worked with these communities to identify some other way for the railroad to support local growth and development without the localized burdens imposed by this shop agreement on the rest of its interstate rail system.. Palestine and Andersen County seek to continue enforcement of the shop agreement, and Union Pacific now seeks a declaratory judgment that those state-law obligations are null and void and an injunction against the enforcement of those obligations by state officials. *See* 28 U.S.C. § 2201.

## PARTIES

9.   Union Pacific is a Delaware corporation with its principal place of business in Omaha, Nebraska.

10.  Palestine is an incorporated city located in Anderson County, Texas.

11.  Anderson County is a political subdivision of the State of Texas.

4

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction over this action because the parties are citizens of different states and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332. "In an action for declaratory relief, the amount in controversy is 'the value of the right to be protected or the extent of the injury to be prevented.'" *Hartford Ins. Group v. Lou-Con Inc.*, 293 F.3d 908, 910 (5th Cir. 2002). Here, the cost to Union Pacific of performing the localized requirements of shop agreement, despite the burdens imposed on the railroad's interstate business and operations, far exceeds $75,000.

13. This Court also has subject-matter jurisdiction over this action because Union Pacific's complaint for declaratory and injunctive relief raises questions of federal law. 28 U.S.C. § 1331. Union Pacific seeks a declaration that the state-law obligation that Palestine and Anderson County impose through the shop agreement is completely preempted. *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 807 (5th Cir. 2011); *see also Franks*, 593 F.3d at 407 (complete preemption "transform[s] [a state-law claim] into one that arises under federal law when a federal statute commands the entire legal arena and in effect displaces any competing state law"). Union Pacific also seeks an injunction against the enforcement of the unlawful obligation on preemption grounds. *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 330 (5th Cir. 2008) ("[A] plaintiff who seeks injunctive relief on preemption grounds necessarily presents a federal question.").

14. This Court has personal jurisdiction over Palestine and Anderson County because they are subject to the jurisdiction of the Texas courts. Fed. R. Civ. P. 4(k); Tex. Civ. Prac. & Rem. Code § 17.024.

15. Venue is properly located in the U.S. District Court for the Eastern District of Texas because both Palestine and Anderson County are located in that district, and because a substantial

part of the events giving rise to Union Pacific's claims occurred in that district. 28 U.S.C. § 1391(b)(1)-(2).

## LEGAL BACKGROUND

16. ICCTA vests the STB with "exclusive" jurisdiction over "transportation by rail carriers . . . practices, routes, services and facilities of such carriers," and the "construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities." 49 U.S.C. § 10501(b)(1), (2). With certain exceptions not relevant here, the "remedies provided under [ICCTA] with respect to the regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." *Id.* § 10501(b)(2).

17. Courts nationwide apply the same test for ICCTA preemption, which is widely attributed to the Fifth Circuit's decision in *Franks*. Courts recognize two kinds of preemption under ICCTA: "categorical" or "express" preemption, and "as applied" preemption. Categorical preemption displaces state laws that "have the effect of managing or governing rail transportation," but not those that have "a more remote or incidental effect." *Franks*, 593 F.3d at 410 (5th Cir. 2010) (quoting *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001)). A state action is categorically "'preempted on its face despite its context or rationale'" when the state attempts to regulate "matters directly regulated by the STB," such as "the construction, operation, and abandonment of rail lines." *Wedemeyer v. CSX Transportation, Inc.*, 850 F.3d 889, 894 (7th Cir. 2017) (*quoting Union Pac. R. Co. v. Chicago Transit Auth.*, 647 F.3d 675, 679 (7th Cir. 2011)). Even if a state law is not categorically preempted, as-applied preemption prevents the application of that law in a particular case if it "would have the effect of unreasonably burdening or interfering with rail transportation." *Franks*, 593 F.3d at 413.

18. Courts have recognized that "[i]t is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations" than the plain

6

language of 49 U.S.C. § 10501(b) entrusting regulation of railroad operations and facilities to the STB. *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 645 (2d Cir. 2005) (*quoting CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996)). As the Fifth Circuit has explained, "[t]he language of the ICCTA's preemption provision, as well as the body of case law on the matter, evinces an intent by Congress to broadly preempt state law as it relates to rail transportation." *Franks Inv. Co., LLC v. Union P. R. Co.*, 534 F.3d 443, 449 (5th Cir. 2008), *rev'd en banc on other grounds*, 593 F.3d 404 (5th Cir. 2010); *see also City of Auburn v. United States*, 154 F.3d 1025, 1030 (9th Cir. 1998) (surveying cases and adopting a "broad reading of Congress' preemption intent").

## FACTUAL BACKGROUND

### The Original Shop Agreement

19. In 1872, Palestine and Anderson County entered into an oral agreement with the then-Houston and Great Northern Railroad Company (H&GN), a railroad with a line running through Palestine. Under that agreement (the 1872 Agreement), Palestine and Anderson County promised to issue bonds in the amount of $150,000 and to deliver the bonds to H&GN. In return, H&GN promised to extend its rail line to Palestine, construct a depot in the city, and establish and forever maintain its general offices, machine shops, and roundhouses there. Palestine and Anderson County later issued the bonds and delivered them to H&GN.

20. In 1874, H&GN sought to merge with another railroad, the International Railroad Company, which also had a line running through Palestine. As a condition of the merger, the Texas legislature required the resulting company—the I&GN—to agree to establish and forever maintain its offices, machine shops, and roundhouses in Palestine.

21. Almost 30 years later, in 1911, I&GN attempted to move its headquarters to Houston following a corporate reorganization that resulted in a new corporation (which continued

7

under the same name as its predecessor corporation). Palestine and Anderson County sued and sought an injunction to enforce the 1872 Agreement against I&GN.

22. Under then-Texas law, that reorganization voided the 1872 Agreement. *See City of Palestine*, 559 F.2d at 411 (noting that, under Texas law at the time, the "obligation to maintain its offices, shops and roundhouses in Palestine" was a "personal obligation that would not have bound the new company"); *see also Intl. & Great N. Ry. Co. v. Anderson County*, 150 S.W. 239, 250 (Tex. Civ. App. 1912) (purchaser who acquires a railroad in foreclosure "takes the property free from all liability for its former indebtedness not secured by a lien, and free from all mere personal obligations of the former company," including any contract "for the establishment and permanent maintenance of a depot"). But the Texas courts—and ultimately the U.S. Supreme Court—held that the substantive obligations imposed by the 1872 Agreement were maintained by the Office-Shops Act, a Texas statute that specifically required a railroad's successor corporation to inherit this type of obligation. *See Int'l & Great N. Ry. Co. v. Anderson County*, 174 S.W. 305, 319 (Tex. Civ. App. 1915) (affirming the trial court's 1914 decree requiring I&GN to comply with the 1872 agreement), *writ refused* (Apr. 5, 1916), *aff'd*, 246 U.S. 424 (1918). Specifically, the Office-Shops Act required any railroad chartered in Texas to "keep and maintain its general offices" within the state, either at a place specified in the corporation's charter or "at such place . . . where [the corporation] shall have contracted or agreed . . . to locate its general office for a valuable consideration" and expressly required that such obligations would pass to the railroad's corporate successors. Tex. Rev. Civ. Stat. Ann. art. 6423 (1911); *see also Int'l & Great Northern*, 246 U.S. at 432-34 (declining to disturb the Texas courts' interpretation of article 6423 and upholding it against a constitutional challenge). It was only because of this statute that the Texas trial court's

judgment (the 1914 Judgment) imposed the 1872 Agreement's obligations on the surviving company. *City of Palestine*, 559 F.2d at 411.

### The Bankruptcy Proceeding And 1954 Agreement

23. About a decade later, through a series of transactions in the 1920s, I&GN was acquired by the Missouri Pacific.

24. Missouri Pacific and its subsidiaries subsequently filed for bankruptcy in 1933. Their reorganization petition filed with the court and the ICC sought to consolidate Missouri Pacific and its subsidiaries, including I&GN, into a single company. Because the 1914 Judgment applied only to I&GN, and required I&GN to maintain its offices in Palestine, that judgment posed a significant obstacle to the consolidation of the Missouri Pacific subsidiaries. Missouri Pacific could not, however, receive relief from that obligation in the bankruptcy process because of a since-repealed provision of the Bankruptcy Code that rendered non-dischargeable a railroad's "obligation . . . requiring the maintenance of shops, officers and roadhouses at any place." 11 U.S.C. § 205(n) (1970). At the bankruptcy court's urging, therefore, Missouri Pacific negotiated a restructuring of the I&GN's obligation with Palestine and Anderson County, designed to translate that obligation into a new world in which the old I&GN operations would be merged into a much larger railroad. *See City of Palestine*, 559 F.2d at 412.

25. Those negotiations produced a new written agreement (the 1954 Agreement), signed on December 21, 1954. *Id.* at 412; *see* Ex. A. The 1954 Agreement displaced the 1914 Judgment and required that, "as long as [Missouri Pacific] or any successor in interest or assign thereof shall remain in the railroad business, [Missouri Pacific] shall, each calendar year, actually employ or cause to be employed at Palestine, Texas, during that year, a number of Office and Shop Employees which shall be not less than . . . 4.5% of the total of the average number of Office and Shop Employees employed by [Missouri Pacific] at all points for the same year." Ex. A at 4-5.

9

The 1954 Agreement also provides for the reinstatement of the 1914 Judgment at Palestine and Anderson County's election in the event of breach. Ex. A at 9-10. In 1955, the Texas trial court modified the 1914 Judgment to allow the 1954 Agreement to take effect. With that matter resolved, Missouri Pacific and I&GN were consolidated into a single entity.

### The ICC Proceeding And Union Pacific/Missouri Pacific Merger

26. During the 1970s, Missouri Pacific again sought permission from the ICC to merge with two subsidiaries. At the time, the ICC's merger review authority included the power to relieve railroads of state law obligations "insofar as may be necessary to enable [the railroad] to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission." 49 U.S.C. § 5(11) (1970). Missouri Pacific asked the ICC to void the 1954 Agreement pursuant to that authority, as an inappropriate burden on the interstate railroad operations of the new, consolidated railroad.

27. Endorsing and adopting the findings of an administrative law judge after a trial and full record, the ICC concluded that the 1954 Agreement "impose[s] unduly burdensome, inefficient, injuriously wasteful, and unnecessary obligations on the proposed unified operations and upon interstate commerce" that "are contrary to the public interest and the national transportation policy." 348 I.C.C. at 430. The ICC further explained that it had "on numerous occasions relieved carriers from the same Texas statutes and similar contractual obligations" pursuant to its Interstate Commerce Act authority, and that "the arguments of the city of Palestine and county of Anderson, Tex., are without merit." *Id.* (citing *St. Louis S.W. Ry. Co. of Texas Lease*, 290 I.C.C. 205 (1953); *Kansas City Southern By. Co. Merger*, 254 I.C.C. 529 (1943)); *see also, e.g., Texas v. United States*, 292 U.S. 522 (1934) (holding that the ICC had authority to relieve railroads from the effects of the Texas statute pursuant to its authority to approve railroad leases).

10

28. The ICC also adopted and quoted from the ALJ's more specific findings that the 1954 Agreement was "clearly contrary to sound business policy and inconsistent with [the railroad's] duty to provide an economic and efficient transportation system to the public," because it "restricts managerial discretion as to where to locate various operations and employees in the most efficient and economic way as public services requirements fluctuate on [the railroad's] system." 348 I.C.C. at 442-43. The ALJ found that locating the railroad's freight claims department in Palestine resulted in "inefficient handling" of shipper compensation claims and that consolidating the freight claims department at the railroad's central offices "could eliminate 31,320 unneeded man hours" or the equivalent of 15 employees and $240,238.00 per year in the freight claims section alone. *Id.* at 443. The ALJ similarly found that the mechanical department employees stationed in Palestine "could be better and more efficiently utilized at other locations more suitable as service locations for MoPac's system," that the shop facilities in Palestine are "congested, poorly tooled and obsolete," and that "[n]ew shop facilities could not practically be built in Palestine, Texas because of the physical constraints of the surrounding town" and because "the general topography in the area surrounding Palestine, Texas, is not conducive for locating a major yard or major repair facility." *Id.*

29. The Fifth Circuit's decision vacating the ICC's decision rested entirely on different grounds and did not question those findings. The Fifth Circuit held that the ICC's authority to displace state law obligations under § 5(11) extended only to "setting aside state restraints to the effectuation of an approved section 5(2) transaction and no further," and that "[a]lthough the Palestine Agreement may burden MoPac, the agreement clearly is not an obstacle to the merger … and does not threaten the merger's success. *City of Palestine*, 559 F.2d at 414; *see also id.* ("In its grant of approval authority, Congress did not issue the ICC a hunting license for state laws and

11

contracts that limit a railroad's efficiency unless those laws or contracts interfered with carrying out an approved merger."). The Fifth Circuit noted that its holding "might differ if Congress had granted the Commission direct authority to nullify any contract presenting a burden on interstate commerce, but we find no congressional award of such power to the ICC" independent of its authority to nullify genuine obstacles to a proposed merger. *Id.* at 415.

30. Twenty years later, on January 1, 1997, Missouri Pacific was merged into Union Pacific, with Union Pacific remaining as the surviving corporation.

**THE 1954 AGREEMENT IS PREEMPTED BY ICCTA**

31. The Fifth Circuit decided *City of Palestine* under statutes that gave the former ICC discretionary authority to relieve railroads of state law obligations in certain circumstances but not others. That legal regime has since been replaced by Congress with ICCTA's sweeping and self-executing preemption provision, which automatically nullifies state law obligations that regulate railroad operations or impose excessive burdens on railroad operations. The 1954 Agreement and the earlier Texas law obligations that it embodies are categorically preempted by ICCTA.

32. The Texas legislature acknowledged that the former Office-Shops Act, which was the basis of the 1914 Judgment that led to the 1954 Agreement, was inconsistent with the STB's exclusive jurisdiction and preempted by ICCTA when it voluntarily repealed that statute in 2007. *See* 2007 Tex. Sess. Law Serv. Ch. 1115, § 5(2); H.R. 80-3711, Reg. Sess. at 1 (Tex. 2007) ("The majority of statutes [repealed herein] were established in the late 19th century or early 20th century and since have been preempted by federal law. The federal [STB] has exclusive jurisdiction over the business operations of railroads . . . ."). The Texas Legislature was correct. The Office Shops Act, and the 1914 Judgment and 1954 Agreement that directly reflected the obligations imposed by that Act, directly regulate matters within the STB's exclusive jurisdiction—including railroad

12

operations and the location of railroad facilities—and therefore are categorically preempted under the *Franks* test.

33. Even if the 1954 Agreement were not categorically preempted, it would be invalid "as-applied" because it "has the effect of unreasonably burdening or interfering with rail transportation." *Franks*, 593 F.3d at 413. The Agreement requires Union Pacific to locate a substantial number of office employees in Palestine, despite the fact that Palestine is located far from the railroad's corporate headquarters in Omaha. It also requires the railroad to locate certain mechanical operations at Palestine, despite the facts that Palestine is not centrally located on Union Pacific's rail network and the Palestine maintenance facilities are outdated and not suitable for modernization. These state law obligations unreasonably burden Union Pacific's operations, make its interstate rail system less efficient and more expensive to operate, and impose additional costs on the shipping public. These are precisely the sort of burdens that the ICC found to "impose unduly burdensome, inefficient, injuriously wasteful, and unnecessary obligations on the [railroad] and upon interstate commerce" that "are contrary to the public interest and the national transportation policy." 348 I.C.C. at 430. The circumstances that led the ICC to that conclusion in 1974 have, if anything, become more pronounced. The Missouri Pacific is now part of the Union Pacific, which operates 32,000 miles of track in 23 states. The localized requirements of the 1954 Agreement are even more burdensome and inefficient for Union Pacific's rail network than they were for the old Missouri Pacific.

34. The fact that these obligations are embodied in a contract signed in 1954 does not save them from ICCTA preemption. Fifth Circuit precedent clearly establishes that even generally applicable state law, like the law of negligence or nuisance, can be categorically preempted by ICCTA when the state law obligation would have the effect of directly regulating rail

transportation or facilities. *See Franks*, 593 F.3d at 411; *Friberg*, 267 F.3d at 440-41; *Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 806 (5th Cir. 2011) ("We have already held the ICCTA completely preempts state law tort actions that 'fall squarely' under § 10501(b)." (citations omitted)); *see also, e.g., Pace v. CSX Transp., Inc.*, 613 F.3d 1066, 1070 (11th Cir. 2010) ("The ICCTA expressly preempts state remedies involving the operation of the side track. Therefore, we will not permit landowners to circumvent that Congressional decision through state law nuisance claims.").

35. The Fourth Circuit has held that contractual obligations voluntarily assumed by the railroad are not subject to categorical preemption analysis, and that "as applied" challenges will rarely succeed because the railroad's voluntary agreement is strong evidence that the exchange of value inherent in the contract furthers, rather than obstructs, interstate commerce. *See PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 218-22 (4th Cir. 2009) ("voluntary agreements must be seen as reflecting the carrier's own determination and admission that the agreements would not unreasonably interfere with interstate commerce"). But even assuming the Fifth Circuit would embrace those principles, the 1954 Agreement still would be preempted, because the law in effect at the time of the 1954 Agreement did not allow the Missouri Pacific a choice.

36. In *City of Palestine* the Fifth Circuit acknowledged Missouri Pacific's point "that the 1954 Palestine Agreement is not a true contract but instead derives its power from the Texas statutes requiring railroad companies to continue maintaining their offices, shops, and roundhouses in their previously established locations." 559 F.2d at 413. Missouri Pacific "would have remained bound by the 1914 judicial decree" even if it had not signed the 1954 Agreement, and if it breached that agreement "the 1914 decree could be reinstated." *Id.* Accordingly, Missouri Pacific urged that the 1954 Agreement is "indistinguishable from the state statutes that led to its birth." *Id.*

37. The Fifth Circuit's holding about the scope of the ICC's merger review authority meant that it did not need to resolve that dispute, but surely Missouri Pacific was right. There has never been anything voluntary about the 1954 Agreement. When Missouri Pacific signed the 1954 Agreement, its subsidiary I&GN was bound by a final judicial decree to keep its general offices in Palestine forever. That 1914 Judgment did not reflect any voluntarily assumed obligations of the railroad. The Fifth Circuit recognized that under Texas law the original voluntary promises were personal obligations of entities that no longer existed. *See City of Palestine*, 559 F.2d at 411 (noting that the Texas cases about this dispute "clearly" recognize that the original obligation had become unenforceable). The 1914 Judgment instead rested squarely on a since-repealed Texas statute that even the Texas legislature has recognized would be preempted, if it were still on the books. *Supra* para. 30. Missouri Pacific could not even discharge the obligations embedded in that 1914 Judgment through bankruptcy, because of a since-repealed provision of the Bankruptcy Code. 11 U.S.C. § 205(n) (1970).

38. The present form of the 1954 Agreement, therefore, reflects at most a determination by the Missouri Pacific to accept the restructuring of an obligation imposed involuntarily and unavoidably by Texas law, as the price of securing the efficiencies associated with consolidating its business operations into one entity. The 1954 did not represent any calculation by the railroad that the benefits obtained outweighed the costs of permanently locating employees and operations in Palestine—because the railroad was offered no alternative. Those costs were, under the then-existing legal regime already sunk. A "contract" so obviously coerced by the requirements of a state statute clearly is not a "true contract" but instead "indistinguishable from the statutes that led to its birth," *City of Palestine*, 559 F.2d at 413. It is therefore preempted as a matter of law.

## COUNT I

## ICCTA Preemption

39. Union Pacific realleges and incorporates by reference Paragraphs 1-38 as though they were set forth fully here.

40. The 1954 Agreement has "the effect of managing or governing rail transportation." *Franks*, 593 F.3d at 410. It is therefore categorically preempted under ICCTA.

41. The 1954 Agreement has "the effect of unreasonably burdening or interfering with rail transportation." *Franks*, 593 F.3d at 413. It is therefore preempted under an as-applied ICCTA preemption analysis.

## PRAYER FOR RELIEF

It is Union Pacific's express intention to continue to honor and operate under the 1954 Agreement until such time as it is judicially declared to be invalid and unenforceable. To that end, Union Pacific demands judgment against the City of Palestine and Anderson County as follows:

A. A declaration that: (i) the 1954 Agreement is preempted by ICCTA and so is null and void; and (ii) Union Pacific is under no obligation to honor any of the 1954 Agreement's terms, including any requirement that the railroad station any portion of its workforce or operations at Palestine;

B. And for the same reasons that the requested relief is sought from the application of the 1954 Agreement, after the 1954 Agreement is declared invalid, then a declaration that: (i) the 1914 Judgment of the District Court of Cherokee County, cannot and should not be reinstated because it was invalidated in 1954 and remains invalid; and (ii) Union Pacific is under no obligation honor any of the 1914 Judgment's terms, including any requirement that the railroad station any portion of its workforce or operations at Palestine;

C. An injunction against Palestine and Anderson County enjoining the enforcement of the 1954 Agreement against Union Pacific or any of its successors and assigns;

D. An injunction against Palestine and Anderson County enjoining the enforcement of the 1914 Judgment against Union Pacific or any of its successors and assigns;

E. A declaration that neither Union Pacific or any of its successors and assigns are required to maintain employees or facilities in Palestine, Texas or Anderson County, Texas.

F. Any other relief whether at law or in equity that the Court deems just and proper.

Respectfully submitted,

*/s/ John W. Proctor*
John W. Proctor
Texas State Bar No. 16347300
jproctor@brownproctor.com
Nathan Schattman
Texas State Bar No. 00791606
nschattman@brownproctor.com
BROWN, PROCTOR & HOWELL, LLP
830 Taylor Street
Fort Worth, Texas 76102
Phone: (817) 332-1391
Fax: (817) 870-2427

*/s/ Trey Yarbrough*
Trey Yarbrough
Bar No. 22133500
**Yarbrough Wilcox, PLLC**
100 E. Ferguson, Suite 1015
Tyler, Texas 75702
903-595-3111 office
903-595-0191 fax
trey@yw-lawfirm.com

COUNSEL FOR PLAINTIFF
UNION PACIFIC RAILROAD COMPANY