## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| UNION PACIFIC RAILROAD COMPANY, §§§§§§§§§§§ | |
| Plaintiff, | |
| v. | Case No. 6:19-cv-574-JDK |
| CITY OF PALESTINE, *et al.*, | |
| Defendants. | |

## ORDER AND OPINION

This case has its origins in a nineteenth-century relic—a "shop agreement" in which a railroad promised to maintain shops and offices in a particular municipality in exchange for government subsidies to expand the rail line. Plaintiff Union Pacific Railroad Company alleges that its agreement with the City of Palestine and Anderson County, Texas, is preempted by a federal statute, the Interstate Commerce Commission Termination Act (ICCTA). Union Pacific seeks a declaration voiding the agreement and an injunction prohibiting the City and County from enforcing it.

Pending before the Court are two motions to dismiss filed by the City and County and the Parties' cross-motions for summary judgment. For the reasons discussed below, the Court **DENIES** Defendants' motions to dismiss (Docket Nos. 40 & 41), **GRANTS** Plaintiff's motion for summary judgment (Docket No. 39), and **DENIES** Defendants' motion for summary judgment (Docket No. 42).

1

# I. BACKGROUND

Union Pacific's contractual relationship with the City of Palestine and Anderson County originated nearly 150 years ago.   In 1872, Union Pacific's predecessor in interest contracted with the City and County to run its rail line to and through Palestine.   *City of Palestine v. United States*, 559 F.2d 408, 410 (5th Cir. 1977).[1]  At that time, the railroad promised to "locate and establish and forever thereafter keep and maintain" its "general offices, machine shops and roundhouses" in Palestine.   *Id.*  And Palestine promised to raise $150,000 in bonds for the railroad from the citizens of Anderson County.   *Id.*

In 1873, the railroad company merged with a second line.   The Texas Legislature approved the merger on the condition that the merged company assume "all acts done in the name of either of the companies."   *Id.*  The new railroad therefore agreed to establish its "general offices, machine shops and roundhouses" in Palestine. *Id.*   In 1875, the citizens paid an additional $150,000 in bonds and agreed to "construct, at their own cost and expense, housing for the officers and employees of the company."   *Id.*

In 1911, the railroad's creditors reorganized the business into the new International & Great Northern Railroad (I&GN), subject to all the predecessor railroad's rights and liabilities.   *Id.* at 410–11.   I&GN's corporate charter located the railroad's offices in Houston, Texas.   *Id.* at 411.   The City and County sued I&GN,

---

[1] The key facts in this case are undisputed.  The Fifth Circuit stated the relevant facts in a 1977 opinion, which adjudicated a different dispute involving the same 1954 Agreement.  *See City of Palestine*, 559 F.2d at 408.  That opinion construed and applied the ICCTA's predecessor statute, the Interstate Commerce Act (ICA).  *Id.*

seeking an injunction to enforce the railroad's obligation to locate its "general offices, machine shops and roundhouses" in Palestine. *Id.* The City and County won, and the Cherokee County District Court issued a decree (the 1914 Decree) forever binding I&GN to maintain its general offices, machine shops, and roundhouses in Palestine.[2] *Id.* at 412.

The 1914 Decree complied with Texas's "Shop Act," which statutorily required "a railroad company chartered by the state without charter-designated office location" to:

> keep and maintain its general offices at such place within this state where it shall have contracted or agreed, or shall hereafter contract or agree, to locate its general office for a valuable consideration. . . . And such railroads shall keep and maintain their machine shops and roundhouses, or either, at such place or places as they may have contracted to keep them for a valuable consideration received; and, if said general offices and shops and roundhouses, or either, are located on the line of a railroad in a county which has aided said railroad by an issue of bonds in consideration of such location being made, then said location shall not be changed; and this shall apply as well to a railroad that may have been consolidated with another as to those which have maintained their original organization.

*Id.* (quoting TEX. REV. CIV. STAT. art. 6423 (1911)).

Missouri Pacific (MoPac) subsequently acquired I&GN as a subsidiary. *Id.* During the Great Depression, MoPac filed for bankruptcy and requested reorganization under Bankruptcy Act § 77. *Id.* In its request, MoPac proposed to consolidate with its subsidiaries, including I&GN. *Id.* But the 1914 Decree required I&GN to maintain its offices in Palestine, and MoPac's offices were located elsewhere.

---

2 On appeal, the U.S. Supreme Court affirmed the decision. *Int'l & Great N. Ry. Cnty. v. Anderson County*, 246 U.S. 424, 432–34 (1918) ("The [office and shops] requirement is perpetual until the law is changed. When and how it may be changed is not before us now.").

*Id.*  The Bankruptcy Act, moreover, expressly required enforcement of the 1914 Decree.  Section 77(n) stated:

> No reorganization effected under this title and no order of the court or Commission in connection therewith shall relieve any carrier from the obligation of any final judgment of any Federal or State court rendered prior to January 1, 1929, against such carrier or against one of its predecessors in title, requiring the maintenance of offices, shops, and roundhouses at any place, where such judgment was rendered on account of the making of a valid contract or contracts by such carrier or one of its predecessors in title.

*Id.* (quoting 11 U.S.C. § 205(n) (1970)).

At the request of the bankruptcy court, MoPac negotiated with the City and County in 1954 to modify the 1914 Decree.  *Id.*  Pursuant to the agreement (the 1954 Agreement), "MoPac agreed to forever maintain in Palestine 4.5% of all of its employees in certain job classifications" and was no longer required to "maintain its general offices, shops and roundhouses in Palestine."  *Id.*  The percentage was subject to fractionation if the railroad subsequently merged, combined, or consolidated.  Docket No. 39, Ex. 1 at 23–24.  In 1955, the District Court of Cherokee County, Texas, entered a judgment to modify the 1914 Decree according to the 1954 Agreement.  *Id.*, Ex. 3.  The bankruptcy court approved the reorganization.  *City of Palestine*, 559 F.2d at 412.

Nearly thirty years passed, and then several key events occurred.  In 1982, Union Pacific acquired MoPac.  *Id.*, Ex. 10 at 1 ¶ 4.  In 1995, Congress passed the ICCTA, establishing the Surface Transportation Board to regulate rail carriers and preempting state and local laws that come within the Board's jurisdiction.  Pub. L. No. 104-88, 109 Stat. 803 (1995); *Tex. Cent. Bus. Lines Corp. v. Midlothian*, 669 F.3d

4

525, 530 (5th Cir. 2012).  In 1997, Union Pacific merged into MoPac.  Docket No. 39, Ex. 10 at 1 ¶ 4.  And in 2007, Texas repealed its Shop Act, concluding that it was preempted by the ICCTA.  H.R. 80-3711, Reg. Sess. at 1 (Tex. 2007).

At present, Union Pacific must employ 0.52% of its "Office and Shop Employees" in Palestine, Texas.  Docket No. 39, Ex. 4 at 31:7–17.  The 1954 Agreement defines "Office and Shop Employees" to include the following classifications: Executives, Officials, and Staff Assistants; Professional, Clerical, and General; Maintenance of Equipment and Stores; Transportation (other than Train, Engine and Yard); Transportation (Yardmasters, Switch Tenders, and Hostlers). Docket 1, Ex. 1 at 3.  In this lawsuit, Defendants do not assert that Union Pacific has breached the 1954 Agreement.  *See* Docket No. 51 at 8 ¶ 17.  Instead, Union Pacific alleges that the ICCTA preempts the 1954 Agreement and seeks a declaratory judgment and injunctive relief to void its obligations under the Agreement.

## II. DEFENDANTS' MOTIONS TO DISMISS

The City and County have filed two motions to dismiss.  The first argues that Federal Rule of Civil Procedure 12(b)(7) requires dismissal because a class of Palestine and Anderson County citizens is necessary to the suit under Federal Rule of Civil Procedure 19.  Docket No. 40.  The second motion seeks dismissal under Federal Rule of Civil Procedure Rule 12(c) on three grounds: (1) the Court lacks subject matter jurisdiction, (2) the Anti-Injunction Act bars this suit, and (3) the limitations period has expired.  The Court **DENIES** both motions.

### A. DEFENDANTS' MOTION TO DISMISS UNDER RULE 12(B)(7) AND RULE 19

Under Rule 12(b)(7), a party may seek dismissal for "failure to join a party under Rule 19."  Rule 19(a)(1) provides that a party must be joined if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
>> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>>
>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

A Rule 19(a) analysis is subject to a burden-shifting framework.  The movant bears the "the initial burden of demonstrating that a missing party is necessary." *Hood ex rel. Miss. v. City of Memphis*, 570 F.3d 625, 628 (5th Cir. 2009).  If "an initial appraisal of the facts indicates that a possibly necessary party is absent," then the burden shifts to the opposing party to show that the missing party is not necessary.

6

*Id.* (quoting *Pulitzer–Polster v. Pulitzer*, 784 F.2d 1305, 1309 (5th Cir. 2006)).   In making Rule 19 determinations, "'pragmatic concerns, especially the effect on the parties and on the litigation,' will control." *Tetra Techs., Inc. v. La. Fruit Co.*, No. 06-CV-3736, 2007 WL 54814, at *2 (E.D. La. Jan. 5, 2007), *aff'd*, 252 F. App'x 639 (5th Cir. 2007) (quoting *Smith v. State Farm Fire & Cas. Co.*, 633 F.2d 401, 405 (5th Cir. 1980)).[3]

Here, the City and County argue that the historic Citizens Committee is a necessary party under Rule 19(a)(1)(A) and (B).  The Citizens Committee was a group of ten local citizens who signed the 1954 Agreement, along with representatives from the railroad, the City of Palestine, and Anderson County.  Docket No. 39, Ex. 1 at 13.  The Committee's history is unclear, but the entity is undisputedly inactive today, and no member has sought to be a party in this case.  Docket No. 44 at 1.  As explained below, Union Pacific has demonstrated that the Court can accord complete relief without the Committee and that the Committee has no interest in the action.  Accordingly, the Court finds that the Citizens Committee is not a necessary party under Rule 19(a) and denies the motion to dismiss.  *See Nat'l Cas. Co.*, 637 F. App'x at 815.

---

[3]  If a party is required to be joined under Rule 19(a), but joinder is not feasible, Rule 19(b) provides that the Court must determine "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed" based on a variety of factors.  If joinder is not required under Rule 19(a), "no inquiry under Rule 19(b) is necessary." *Nat'l Cas. Co. v. Gonzalez*, 637 F. App'x 812, 815 (5th Cir. 2016) (per curiam) (quoting *Temple v. Synthes Corp.*, 498 U.S. 5, 8 (1990)).  Because the Court finds that joinder is not required here, it will not address Rule 19(b).

### 1. Joinder is not required under Rule 19(a)(1)(A).

The City and County first argue that joinder is required under Rule 19(a)(1)(A) because the Citizens Committee was a party to the 1954 Agreement (and an active participant in antecedent agreements) and that the Court therefore "cannot accord complete relief" without the Committee. Docket No. 40 at 2. Union Pacific responds that the Committee does not have a legally protectable interest in the 1954 Agreement, so the Court can accord complete relief without the Committee's involvement. Docket No. 44 at 4. Reviewing the 1954 Agreement, the Court agrees that the Citizens Committee lacks a legal interest in its enforcement, and thus the Court can accord complete relief without joining the Committee.

To determine whether complete relief is available without the absent party, "the Court looks to the relief prayed for by the claimant." *Cain v. City of New Orleans*, 184 F. Supp. 3d 349, 358 (E.D. La. 2016). Here, Union Pacific seeks declaratory and injunctive relief against the City of Palestine and Anderson County. Docket No. 1 at 16–17. The requested declaratory relief would render null and unenforceable the 1954 Agreement and its predicate, the 1914 Decree. The Citizens Committee was a signatory to the 1954 Agreement, and a representative class of citizens was a party to the litigation resulting in the 1914 Decree. Docket No. 1, Ex. 1 at 13; Docket No. 40, Ex. 1 at 7. "Generally, when interpretation of a contract is necessary, the parties to the contract must be joined." *Optimum Content Prot., LLC v. Microsoft Corp.*, No. 6:13-CV-741, 2014 WL 12452439, at *3 (E.D. Tex. Aug. 25, 2014), *R. & R. adopted*, No. 6:13-CV-741, 2014 WL 12324277 (E.D. Tex. Oct. 7, 2014).

But here, the Citizens Committee has no right to enforce the 1954 Agreement. Rather, the Agreement assigns enforcement rights exclusively to the City and County, providing that in the event of breach, only the City and County may:

(a) Require specific performance by the RAILROAD of its obligations hereunder; or

(b) Notify the RAILROAD in writing of the intention of the City and County to rescind this new agreement . . . . the City and County may apply to the proper court for a hearing to determine whether any of said defaults exist as claimed and constitute unexcused breach of this Agreement and the new judgment based thereon . . . .

Docket No. 1, Ex. 1 at 9–10.  Further, the City and County may exercise or enforce any "right or remedy" available to the citizens.  As the Agreement provides: "the City and County may either concurrently, independently, or cumulative of the foregoing, exercise or enforce any other right or remedy which may be available to the City and County and their citizens under the then existing circumstances."  *Id.* 1 at 10–11. The Citizens Committee, then, has no contractual interest in the 1954 Agreement's enforcement.[4]

Though the Citizens Committee paid separate consideration for the 1954 Agreement's antecedent contracts, the Committee does not have an enforcement right in the 1954 Agreement.  Like a predecessor in interest, the Citizens Committee has "no remaining rights in the subject properties or interest in the outcome of this case." *Samson Contour Energy E & P, LLC v. Fred Bowman, Inc.*, No. 11-CV-0247, 2011 WL 6157481, at *3 (W.D. La. May 11, 2011), *R. & R. adopted*, No. 11-CV-0247, 2011 WL

---

[4]  This determination moots the Parties' dispute as to whether Defendants' Exhibits 2 & 3, Docket No. 40, constitute hearsay.  *See* Docket Nos. 44 at 4; 49 at 2.

2295022 (W.D. La. June 9, 2011).  Absent a "protectable interest that is the subject of the case," the nonparty's joinder is not required.  *Pearson's Inc. v. Ackerman,* No. 7:18-CV-00013-BP, 2018 WL 5886608, at *3 (N.D. Tex. Nov. 9, 2018).  While the citizens of Palestine and Anderson County may have a general interest in the outcome of the case, the 1954 Agreement renders that interest non-protectable such that the Citizens Committee or an equivalent group is not a required party.  *Cf. BroadStar Wind Sys. Grp. Ltd. Liab. Co. v. Stephens*, 459 Fed. Appx. 351, 357 (5th Cir. 2012) (per curiam) ("While [the absent party] certainly had interests in the outcome of the suit, as a non-party to the contract which was the sole basis for the declaratory judgment suit, [it] was neither necessary nor indispensable.").

### 2. Joinder is not required under Rule 19(a)(1)(B)(i).

Defendants next argue that joinder is required under Rule 19(a)(1)(B)(i) because resolving this case without the Citizens Committee would prejudice the Committee's rights under the 1954 Agreement.  Union Pacific contends that the Committee has no rights under the Agreement, and, even if it did, the joined parties adequately represent the Committee's interest in the litigation, so joinder is not necessary.  The Court agrees with Union Pacific.

Rule 19(a)(1)(B)(i) requires joinder if a person "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: as a practical matter impair or impede the person's ability to protect the interest."  This rule does not require joinder of the Citizens Committee for at least three reasons.

*First*, no Committee member (or successor in interest) has claimed a legal interest in this dispute.  "[T]he fact that an absent party does not seek joinder by its own volition indicates that it lacks an interest relating to the subject matter of the action."  *Canal Ins. Co. v. Xmex Transp. LLC*, No. EP-13-CV-156-KC, 2013 WL 5740223, at *4 (W.D. Tex. Oct. 22, 2013).

*Second*, as discussed above, the Citizens Committee's interest in this litigation is not legally protectable.  Consequently, non-joinder of the Committee does not "impair or impede" its ability to protect a legal interest.

*Third*, in this case, the absent Committee has the same interests as the joined parties such that its "interests are protected by [the joined parties'] vigorous litigation in the [] dispute."  *Fed. Ins. Co. v. Singing River Health Sys.*, 850 F.3d 187, 201 (5th Cir. 2017).  Defendants argue that their interest may differ from the Citizen Committee, *e.g.*, the Citizens Committee may desire amendment of the 1954 Agreement.  Docket No. 49 at 3.  But this case does not—and could not—contemplate amendment.  Here, the ICCTA either preempts the 1954 Agreement or it does not.  Both sides of this issue are represented by the present parties, so any potential interest of the Citizens Committee is protected by the existing parties' "vigorous litigation."  *Singing River Health*, 850 F.3d at 201.

### 3. Joinder is not required under Rule 19(a)(1)(B)(ii).

Finally, the City and County contend that joinder of the Committee is required by Rule 19(a)(1)(B)(ii) because the Committee may sue to enforce the 1954 Agreement even if an injunction bars the City and County from enforcing it.  Union Pacific argues

that this is a non-issue because the Committee has no enforcement rights under the Agreement.  Again, the Court agrees with Union Pacific.

Joinder is required under Rule 19(a)(1)(B)(ii) if a person "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."  Here, the Citizens Committee does not have the power to enforce the 1954 Agreement, *see supra* Part II.A.1., and thus has no legal "interest relating to" it.  In other words, because the Citizens Committee lacks a mechanism to unilaterally enforce the 1954 Agreement, there is no risk of inconsistent obligations here.

*     *     *

Because non-joinder of the Citizens Committee does not preclude complete relief, "impair or impede" the Committee's ability to protect a legal interest, or risk inconsistent obligations, the Citizens Committee is not a required party under Rule 19(a).  The Court therefore **DENIES** Defendants' Motion to Dismiss under Rule 12(b)(7) (Docket No. 40).

### B. DEFENDANTS' MOTION TO DISMISS UNDER RULE 12(C)

Defendants next move for dismissal under Federal Rule of Civil Procedure 12(c), arguing that the Court lacks subject matter jurisdiction, that the Anti-Injunction Act bars Union Pacific's claim, and that the governing limitations period has run.  For the reasons discussed below, the Court **DENIES** Defendants' motion.

### 1. Legal Standard

Rule 12(c) permits a party to move for judgment on the pleadings after the pleadings are closed but early enough not to delay trial. The rule is designed to "dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Garza v. Escobar*, 972 F.3d 721, 727 (5th Cir. 2020) (quoting *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002)). "The standard for dismissal under Rule 12(c) is the same as that under Rule 12(b)(6)." *Id.* (quoting *Hale v. Metrex Research Corp.*, 963 F.3d 424, 427 (5th Cir. 2020)).

Under Rule 12(b)(6), a party may seek dismissal for failure to state a claim upon which relief can be granted. "Thus, claims may be dismissed under Rule 12(b)(6) 'on the basis of a dispositive issue of law.'" *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019) (quoting *Neitzke v. Williams*, 490 U.S. 319, 326 (1989)). In evaluating a Rule 12(b)(6) motion, the Court must "accept as true all well pleaded facts in the complaint." *Campbell v. Wells Fargo Bank, N.A.,* 781 F.2d 440, 442 (5th. Cir. 1986). "All questions of fact and any ambiguities in the current controlling substantive law must be resolved in the plaintiff's favor." *Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir. 2001).

### 2. The Court has subject matter jurisdiction.

The parties do not dispute that diversity jurisdiction exists under 28 U.S.C. § 1332. Docket Nos. 45 at 1–2; 50 at 1. Indeed, Union Pacific is a citizen of Delaware and Nebraska, and Defendants are citizens of Texas. Docket No. 45 at 2. The City

and County appear to argue, however, that diversity jurisdiction is insufficient to award the declaratory and injunctive relief sought by Union Pacific based on its claim of preemption.  Docket No. 50 at 1–3.

The City and County are incorrect.  A federal court sitting in diversity may decide a declaratory judgment action.  *E.g.*, *Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 293 (5th Cir. 2019); *Farkas*, 737 F.3d at 341.  And in this posture, the Court may resolve a plaintiff's preemption claim.  *Pharmacia LLC v. Grupo De Inversiones Suramericana S.A.*, No. 2:15-CV-920-RWS-RSP, 2016 WL 3460767, at *1 (E.D. Tex. Apr. 11, 2016), *R. & R. adopted*, No. 2:15-CV-920-RWS-RSP, 2016 WL 5387776, at *1 (E.D. Tex. Sept. 27, 2016).  Further, as the Fifth Circuit has observed: "We have reviewed several cases in which diversity was alleged as the jurisdictional ground for colorable state claims preempted by federal law.  In these cases, the courts, rather than dismiss, have applied federal substantive law."  *Woodfork v. Marine Cooks & Stewards Union*, 642 F.2d 966, 975–76 (5th Cir. 1981).

### 3. The Anti-Injunction Act does not bar this suit.

The City and County also argue that the Anti-Injunction Act, codified at 28 U.S.C. § 2283, bars Union Pacific's case because a federal court cannot enjoin the City or County from enforcing the 1954 Agreement or the state court 1914 Decree. Docket No. 41 at 14.  Union Pacific contends that the Act is inapplicable here because there is no pending state court proceeding.  Docket No. 45 at 4.  With no state action pending, the Court agrees that the Anti-Injunction Act does not apply.

The Anti-Injunction Act prohibits "an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of

its jurisdiction, or to protect or effectuate its judgments."  28 U.S.C. § 2283.  The Act

may also bar a declaratory judgment action that would interfere with a state lawsuit.

*Travelers Ins. Co. v. La. Farm Bureau Fed'n, Inc.*, 996 F.2d 774, 776 (5th Cir. 1993).

Further, "[i]t is well established that the Act applies only to *pending* state court

proceedings; the Act 'does not preclude injunctions against a lawyer's filing of

*prospective* state court actions.'"  *SEC v. Kaleta*, 530 F. App'x 360, 363 n.4 (5th Cir.

2013) (per curiam) (quoting *Newby v. Enron Corp.*, 302 F.3d 295, 301 (5th Cir. 2002))

(emphasis original).  In the simplest terms, "the Act 'applies only to pending state

court actions.'"  *Fed. Ins. Co. v. Northfield Ins. Co.*, No. CV 4:14-00262, 2019 WL

1302295, at *4 (S.D. Tex. Mar. 21, 2019) (quoting *B&A Pipeline Co. v. Dorney*, 904

F.2d 996, 1001 n.15 (5th Cir. 1990)).

Here, the City and County do not identify any pending proceeding in a state

court.  The Anti-Injunction Act therefore does not apply, and Defendants' argument

for dismissal on this ground fails.

### 4. The statute of limitations does not bar this suit.

Finally, Defendants argue that Union Pacific's claim is untimely.  Citing

Texas's four-year statute of limitations governing contract claims, Defendants argue

that Union Pacific's claim accrued when the ICCTA became law in 1995 or, at the

latest, when Texas repealed the Shop Act in 2007.  Docket No. 41 at 14–15 (citing

TEX. CIV. PRAC. & REM. CODE § 16.004(1)).  Union Pacific argues that the substantive

claim underlying its request for declaratory relief is one for breach of the 1954

Agreement, which has not occurred.  Docket No. 45 at 7–8.

In a declaratory judgment action, "[a] request for declaratory relief is barred to the same extent that the claim for substantive relief on which it is based would be barred." *Mock v. St. David's Healthcare P'ship, LP, LLP*, No. A-19-CV-611-RP, 2020 WL 4434929, at *9 (W.D. Tex. July 31, 2020), *R. & R. adopted*, No. 1:19-CV-611-RP, 2020 WL 5250641 (W.D. Tex. Sept. 2, 2020) (quoting *Int'l Ass'n of Machinists & Aerospace Workers v. Tenn. Valley Auth.*, 108 F.3d 658, 668 (6th Cir. 1997)); *see, e.g.*, *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 409 (5th Cir. 2004).   Here, the substantive claim underlying Union Pacific's declaratory judgment action is a hypothetical claim for breach of the 1954 Agreement.   Docket No. 45 at 8.   But Defendants have not alleged any breach by Union Pacific, and thus the underlying substantive claim is not untimely.   *See Cosgrove v. Cade*, 468 S.W.3d 32, 39 (Tex. 2015) (A "claim for breach of contract accrues when the contract is breached."); *accord Western-Southern Life Assurance Co. v. Kaleh*, 879 F.3d 653, 663 (5th Cir. 2018).

The Court therefore holds that Union Pacific's declaratory judgment action is not barred by the statute of limitations.

*       *       *

Having determined that the Court has subject matter jurisdiction, that the Anti-Injunction Act does not apply, and that the statute of limitations does not bar Union Pacific's claim, the Court **DENIES** Defendants' Motion to Dismiss under Rule 12(c).

### III. UNION PACIFIC'S MOTION FOR SUMMARY JUDGMENT

Union Pacific moves for summary judgment on its claim of preemption (Docket No. 1 at 16 ¶¶ 39–41) and on the City and County's affirmative defenses (Docket No. 24 at 8–12 ¶¶ 43–50).  Docket No. 39 at 4.  Union Pacific argues that the ICCTA expressly and impliedly preempts the 1954 Agreement and that each of the City and County's affirmative defenses fails as a matter of law.  *Id.* at 15–29.

#### A. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A fact is material only if will affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine only if the evidence could lead a reasonable jury to find for the nonmoving party.  *See id.*  In determining whether a genuine issue of material fact exists, the Court views all inferences drawn from the factual record in the light most favorable to the nonmoving party.  *Id.* at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

After the moving party has made an initial showing that there is no evidence to support the nonmoving party's claim, the nonmoving party must assert competent summary judgment evidence to create a genuine fact issue.  *Matsushita*, 475 U.S. at 586.  Mere conclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment

17

evidence.  *See Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).  The nonmoving party must identify evidence in the record and articulate how that evidence supports its claim.  *Ragas*, 136 F.3d at 458.  Summary judgment must be granted if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322–23.

## B. LEGAL FRAMEWORK

### 1. The Constitution's Supremacy Clause

The preemption doctrine is rooted in the United States' federalist design.  Under this system, "the States possess sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause [of the U.S. Constitution]."  *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990).  The Supremacy Clause provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. CONST., art. VI, cl. 2.  Thus, any state law that conflicts with the Constitution or a federal law is preempted, or "without effect."  *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).  "This is an extraordinary power in a federalist system."  *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  "It is a power that we must assume Congress does not exercise lightly."  *Id.*

## 2. The ICCTA

In 1995, Congress overhauled the regulation of the railroad industry by enacting the ICCTA.  The statute repealed the Interstate Commerce Act, abolished the Interstate Commerce Commission, and established the Surface Transportation Board (STB).  49 U.S.C. § 10101, *et seq.*; *see also Friberg v. Kan. City S. Ry. Co.*, 267 F.3d 439, 442 (5th Cir. 2001).  The Fifth Circuit later explained that "[t]he regulation of railroad operations has long been a traditionally federal endeavor, to better establish uniformity in such operations and expediency in commerce, and it appears manifest that Congress intended the ICCTA to further that exclusively federal effort, at least in the economic realm."  *Friberg*, 267 F.3d at 443.

The ICCTA grants the STB exclusive jurisdiction over a wide range of railroad operations.  *See* 49 U.S.C. § 10501.  Section 10501 states in relevant part:

(b) The jurisdiction of the Board over—

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b).  This text guides the Court's preemption analysis because it "necessarily contains the best evidence of Congress' pre-emptive intent."  *Franks Inv.*

*Co. LLC v. Union Pac. R. Co.*, 593 F.3d 404, 408 (5th Cir. 2010) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

### 3. Framework for Preemption Analysis

"In determining the existence and reach of preemption, Congress's purpose is 'the ultimate touchstone' to use." *Franks*, 593 F.3d at 407 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Congress may show its preemptive purpose in two ways. First, the statute may contain "express language." *Id.* (quoting *Altria Grp., Inc. v. Good,* 555 U.S. 70, 76 (2008)). In addressing preemption under the ICCTA, the Fifth Circuit has held that section 10501(b) expressly preempts laws attempting to "manag[e] or govern[] rail transportation." *Id.* at 410. Further, "[t]o the extent remedies are provided under laws that have the effect of regulating rail transportation, they are [expressly] preempted." *Id.* Generally applicable state laws with a "mere 'remote or incidental effect on rail transportation'" are not expressly preempted. *Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 805 (5th Cir. 2011) (quoting *Franks*, 593 F.3d at 410).

Second, a federal statute may impliedly preempt state laws "if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." *Franks*, 593 F.3d at 407 (quoting *Altria Grp.,* 555 U.S. at 76–77). In the context of the ICCTA, preemption by implication is sometimes equated with "as-applied" preemption. *See id.* at 414. In addressing implied preemption under the ICCTA, the Fifth Circuit has held that "state law actions can be preempted as applied if they have the effect of unreasonably burdening or interfering with rail transportation." *Id.* This is a "fact-based test"

requiring proof that the specific state action at issue unreasonably burdened rail transportation.  *Id.*

## C. EXPRESS PREEMPTION

Union Pacific first argues that the ICCTA expressly preempts the 1954 Agreement because the Agreement "implements a state law obligation that directly targets 'the operations of rail transportation.'"  Docket No. 39 at 17.  The City and County contend that the Agreement is a limited personnel requirement that does not regulate "transportation."[5]  Docket No. 51 at 15.  Based on the plain language of the ICCTA, the Court finds that the 1954 Agreement is expressly preempted.

The ICCTA's preemption provision states: "Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."  49 U.S.C. § 10501(b).[6]  As noted above, the Fifth Circuit has construed this provision to mean that laws having "the effect of managing or governing rail transportation will be expressly preempted" and that, "[t]o the extent remedies are provided under laws *that have the effect of regulating rail transportation,* they are preempted."  *Franks*, 593 F.3d at 410 (emphasis original).  Thus, "[f]or a state court

---

[5]  The City and County also argue that the 1954 Agreement is "not subject to express preemption because it is not a state regulation," but instead a voluntary contract.  The Court addresses this argument *infra* Part III.E.

[6]  The Fifth Circuit held in *Franks* that "the relevant part of Section 10501(b) [for preemption purposes] is its second sentence."  595 F.3d at 410.  The first sentence of section 10501(b) "is defining the authority of the STB in dealing with the fundamental aspects of railroad regulation, and barring others from interfering with those decisions by making the jurisdiction exclusive."  *Id.*

action to be expressly preempted under the ICCTA, it must seek to regulate the operations of rail transportation." *Id.* at 413.

Rail "transportation," in turn, is defined broadly by statute to include, among other things, "facilities" and "services" "related to the movement of passengers or property by rail." 49 U.S.C. § 10102(9). Section 10102(9) states:

(9) "transportation" includes—

(A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

(B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property; []

49 U.S.C. § 10102(9).

Applying these provisions, the Fifth Circuit has held that the ICCTA expressly preempted a state law negligence action attempting to "mandate when trains can use tracks and stop on them [because the action] is attempting to manage or govern rail transportation in a direct way." *Franks*, 593 F.3d 411 (discussing *Friberg*, 267 F.3d at 443). The ICCTA did not, however, preempt a state law possessory action attempting to "preserve a long-existing crossing over railroad tracks" because the action was governed by "property laws and rules of civil procedure that have nothing to do with railroad crossings" and only incidentally regulated rail transportation. *Id.* at 406, 411–13.

Turning to the 1954 Agreement, the Court finds that it manages rail transportation in a direct way and is therefore expressly preempted by the ICCTA.

22

The Agreement by its terms requires Union Pacific to employ in Palestine a specific percentage of its "Office and Shop Employees"—defined to include five classes of executive, clerical, maintenance, and transportation personnel.  Docket 1, Ex. 1 at 3. To comply with this requirement, Union Pacific maintains two departments in Palestine:  the car shop, which repairs cars in Union Pacific's fleet, and the freight claims department, which investigates and resolves claims arising out of shipments on Union Pacific's rail line.  Docket No. 39, Ex. 4 at 42:3–19, 115:6–9; Docket No. 42, Ex. 16 at 14:17–15:1.

Absent the Agreement, moreover, Union Pacific would *not* maintain these facilities or services in Palestine.  Indeed, Union Pacific submitted uncontroverted evidence that it would prefer to close its car shop in Palestine in favor of more central locations to maximize efficiencies, but the 1954 Agreement stands in the way.  Docket No. 39, Ex. 14 at 2 ¶ 7 (testifying that the car shops in Missouri and Illinois "are more modern" and are "more conveniently located on Union Pacific's rail network").  And, although Union Pacific would prefer to consolidate its freight claims department at its main headquarters for a variety of business reasons, the 1954 Agreement forecloses that more cost-effective option.  Docket No. 39, Ex. 4, 83:13–21.  The 1954 Agreement thus compels Union Pacific to keep a "facility . . . related to the movement of passengers or property . . . by rail" in Palestine and dictates where Union Pacific may provide certain "services related to that movement"—easily satisfying the definition of regulating rail transportation.  49 U.S.C. § 10102(9); *see Franks*, 593 F.3d at 410; *Friberg*, 267 F.3d at 443–44.

The City and County argue that the 1954 Agreement merely imposes a personnel requirement, which is not a regulation of Union Pacific's facilities and services—and thus does not regulate rail "transportation."  Docket No. 51 at 12. Defendants also repeatedly assert that Union Pacific's operations in Palestine "do not have any relation to the movement of goods or people in interstate commerce."  Docket No. 51 at 14–15.  But, as Union Pacific observes, the company is a "one-trick pony" involved only in the business of moving passengers and property by rail.  Thus, any requirement that Union Pacific maintain a certain number of "Office and Shop" employees in a particular location necessarily regulates "facilities" and "services" related to the movement of people and property by rail.  49 U.S.C. § 10102(9); *see, e.g., Burlington N. Santa Fe Corp. v. Anderson*, 959 F. Supp. 1288, 1296 (D. Mont. 1997) (holding that the ICCTA preempts a regulation regarding "the closure, consolidation or centralization of [ticketing] agencies" because the regulation "has a direct and substantial effect on the field of economic regulation of railroad transportation"); *CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n*, 944 F. Supp. 1573, 1582–85 (N.D. Ga. 1996) (holding that the ICCTA preempts "state regulatory authority over railroad agency closings" because "the function of railroad agencies overlaps substantially with the definition of 'transportation by rail carriers' . . . as including 'storage, handling and interchange of passengers and property'" and "[r]ailroad agencies also seem to fit within any common understanding of 'services' of railroads, over which the STB is given exclusive jurisdiction"); *see also Tex. Cent. Bus. Lines Corp. v. City of Midlothian*, 669 F.3d 525, 530 (5th Cir. 2012) (holding that

24

"transloading" constituted "transportation" because "it concerns the 'elevation' and also the 'storage, handling, and interchange of . . . property' involving the movement of a locomotive").

To be sure, the term "transportation" does not encompass "everything touching on railroads." *Emerson v. Kan. City S. Ry. Co.*, 503 F.3d 1126, 1129 (10th Cir. 2007). But the 1954 Agreement does not merely touch on railroads. It directly regulates rail transportation by prohibiting Union Pacific from abandoning or discontinuing services and facilities in Palestine, requiring the company to utilize facilities inefficiently, preventing the consolidation of rail operations in more cost-effective locations, and increasing the cost of Union Pacific's rail business. Docket No. 39, Ex. 4 at 83:13–21, 109:6–25; 118:14–19; Ex. 6 at 30:4–15; Ex. 11 at 1 ¶ 3; Ex. 14 at 2 ¶ 7. The 1954 Agreement thus has the effect of managing or governing rail transportation as acutely as the property action in *Friberg*, in which a landowner sought to regulate the time a train could occupy a rail crossing in a negligence action against the railroad. 267 F.3d at 443–44. As the Fifth Circuit held in that case, "the all-encompassing language of the ICCTA's preemption clause" plainly prohibits such regulation. *Id.* at 444. So too here.

### D. IMPLIED PREEMPTION

Union Pacific alternatively argues that the ICCTA impliedly preempts the 1954 Agreement because the Agreement has the effect of unreasonably burdening or interfering with rail transportation. Docket No. 39 at 18. The City and County contend that the Agreement at most creates additional costs on Union Pacific, which the railroad could minimize, and does not impose any requirements on the design,

construction, maintenance, or repair of rail lines.  Docket No. 51 at 15.  Having concluded that the ICCTA expressly preempts the 1954 Agreement, the Court need not reach this issue.  Nevertheless, based on the uncontroverted evidence submitted by Union Pacific, the Court finds in the alternative that the ICCTA impliedly preempts the 1954 Agreement as a matter of law.

The Fifth Circuit has adopted a test for determining whether the ICCTA impliedly preempts state action.  *See Franks*, 593 F.3d at 414.  "Under this fact-based test, state law actions can be preempted as applied if they have the effect of unreasonably burdening or interfering with rail transportation."  *Id*.  The party arguing preemption bears the burden of proof and must "come forward with evidence of the specific burdens imposed."  *Elam*, 635 F.3d at 813.  This burden cannot be satisfied with "general evidence or assertions" that the state action would "somehow affect rail transportation."  *Guild v. Kan. City S. Ry. Co.*, 541 F. App'x 362, 368 (5th Cir. 2013).  In *Franks*, the Fifth Circuit held that the ICCTA did not impliedly preempt a state law possessory action seeking to keep open four railroad crossings because the railroad failed to present evidence that the four crossings at issue affected rail transportation.  *See id*. at 415.  Although the railroad presented evidence that "private crossings like the ones at issue here can affect drainage, increase track maintenance costs, and cause trains to move at slower speeds," the railroad "did not tie any of these specific problems to these four crossings."  *Id*.

Applying similar tests, other courts have held as a matter of law that the ICCTA impliedly preempts a variety of state action when the railroad presents

undisputed evidence that the action unreasonably burdens rail transportation.

Preempted actions include:

- A state tort claim alleging that a railroad was negligent in "constructing, repairing, or maintaining the Crossing" because, if plaintiff prevailed, the railroad would be required to undertake "considerable redesign and construction work," amounting to approximately $2 million. *Union Pac. R.R. Co. v. Taylor Truck Line, Inc.*, No. 15- CV-0074, 2018 WL 1750516, at *7–9 (W.D. La. Apr. 10, 2018).

- A state law used to "to regulate (terminate) [the railroad's] use of the easement over [landowners'] property" because there was no question that an attempt "to stop all use of the tracks on the relevant stretch" would effectively prevent or unreasonably interfere with railroad transportation. *Wedemeyer v. CSX Transp., Inc.*, No. 2:13-CV-00440-LJM, 2015 WL 6440295, at *5 (S.D. Ind. Oct. 20, 2015), *aff'd*, 850 F.3d 889 (7th Cir. 2017).

- A state condemnation action that would affect "actively used railroad property" because the taking constituted an unreasonable interference with the railroad's "rights with respect to [a] massive stretch of railroad property." *Union Pac. R.R. Co. v. Chicago Transit Auth.*, No. 07-CV-229, 2009 WL 448897, at *8–10 (N.D. Ill. Feb. 23, 2009), *aff'd*, 647 F.3d 675 (7th Cir. 2011).

Here, Union Pacific has presented substantial, undisputed evidence that the 1954 Agreement unreasonably burdens rail transportation.[7]  By requiring the railroad perpetually to maintain Office and Shop employees in Palestine—despite the railroad's need to adapt in a competitive and rapidly changing market—the Agreement substantially interferes with and burdens Union Pacific's facilities related

---

[7] The City and County object to certain of Union Pacific's evidence as not relevant and thus inadmissible.  Docket No. 51 at 8–10 ¶¶ 1–7.  But the Fifth Circuit has held that a railroad asserting implied preemption under the ICCTA must present specific evidence regarding the particular action at issue—which is exactly what Union Pacific has presented here.  *See Franks*, 593 F.3d at 414–15.  Union Pacific's evidence therefore has a "tendency to make a fact more or less probable than it would be without the evidence" and is "of consequence in determining the action." FED. R. CIV. EVID. 401.  Accordingly, the City and County's objections are overruled.

to the movement of passengers or property.[8]  *See* 49 U.S.C. § 10102(9) (defining "transportation" as a "facility . . . related to the movement of passengers or property"). Indeed, almost fifty years ago, the ICC ruled that the 1954 Agreement "impose[d] undue burdens and obligations" on the railroad and was "contrary to the public interest and the national transportation policy." *Mo. Pac. R.R. Co.*, 348 I.C.C. 414, 430 (1976).[9]

And a lot has changed in the last fifty years, rendering the Palestine facilities even more inefficient, expensive, and burdensome.  As Union Pacific demonstrates, the declining demand for coal in favor of natural gas dramatically reduced one of the most important revenue streams for railroads: the transportation of coal by rail. Docket No. 39, Ex. 4 at 105:7–14.  The loss of this high-margin business forced railroads like Union Pacific to focus on other business segments and become more efficient in their operations.  *Id.* at 105:15–106:2.  As a result, in 2018, Union Pacific adopted a new business model called Precision Scheduled Railroading (PSR).  Docket No. 39, Ex. 23 at 5.  A key PSR principle is "[b]alancing train movements to improve the utilization of crews and rail assets."  *Id.*  The requirement to maintain facilities

---

[8] Union Pacific does not argue that the 1954 Agreement unreasonably burdens its services.  *See* Docket No. 39 at 25; Docket No. 54 at 6–7.

[9]  In the mid-twentieth century, MoPac—Union Pacific's predecessor-in-interest—sought to merge with seven of its subsidiaries, including I&GN.  I&GN was subject to the 1954 Agreement.  The ICCTA was not yet enacted, and the ICC still approved voluntary mergers.  In its merger request, MoPac petitioned the ICC for relief from the 1954 Agreement.  An administrative law judge granted the request and made findings of fact, which the ICC adopted, including that: "the [1954] Agreement . . . and the laws of the State of Texas currently impose undue burdens and obligations on MOPAC and they will impose unduly burdensome, inefficient, injuriously wasteful, and unnecessary obligations on the proposed unified operations and upon interstate commerce."  *Mo. Pac. R.R. Co.*, 348 I.C.C. at 416.  On appeal, the Fifth Circuit did not review the merits of this finding, holding instead that the ICC had exceeded the scope of its authority "when it voids contracts that are not germane to the success of the approved section 5(2) transaction."  *City of Palestine*, 559 F.2d at 414.

in Palestine, however, prevents Union Pacific from achieving that balance.  As Union Pacific's corporate representative testified, Union Pacific has "more efficient locations" that could "absorb the work and reduce costs per car produced just based on the efficiency of the facility."  Docket No. 39, Ex. 4, at 80:2–5.  The car shops in Desoto, Missouri, and Dupo, Illinois, for example, are "more modern and have had recent updates completed."  Docket No. 39, Ex. 14 at 2, ¶ 7; Docket No. 51, Ex. 8 at 9 ¶¶ 4–5.  But because of the 1954 Agreement, Union Pacific continues to send cars to Palestine for repair.

The Palestine facilities are particularly inefficient because they were originally designed to repair steam locomotives.  Docket No. 39, Ex. 14 at 1 ¶ 2.  Union Pacific no longer has a business purpose for repairing steam locomotives, and it now uses the facilities to repair boxcars and open-top hoppers.  Docket No. 39, Ex. 4 at 102:7–11.  These cars, however, are also being phased out.  *Id.*  Union Pacific would therefore like to reduce or eliminate the Palestine repair facility altogether but is prevented from doing so by the 1954 Agreement's personnel quota.  *Id.* at 85:21–86:1.

Further, the Palestine facilities require repair.  Updating the facilities comes at the undisputed estimated price of $67 million to $93 million.  Docket No. 39, Ex. 14 at 1 ¶ 3.  This is a considerable economic burden, and other courts have held that even lesser amounts create an "unreasonable" burden on rail transportation under the ICCTA.  *See, e.g., Taylor Truck Line*, 2018 WL 1750516 at *8–9 (holding the ICCTA preempted a comparative negligence defense where invocation of such defense would cost the railroad an estimated $2 million and compromise the uniform

29

operation of the interstate rail network).  Indeed, as the ICC stated some eighty years ago, perpetual shop and office agreements hinder economy and efficiency in operation and service to the public.  *St. Louis Sw. Ry. Co. of Tex. Lease*, 290 I.C.C. 205, 213 (1953); *accord Kan. City S. Ry. Co. Merger*, 254 I.C.C., 259, 535–38 (1943).

The City and County argue that the 1954 Agreement simply requires Union Pacific to maintain only half of one percent of its employees in Palestine and that any increased costs associated with that requirement is not an unreasonable burden on the railroad.  Docket No. 51 at 16.  To be sure, the Fifth Circuit has expressed doubt that "increased operating costs are alone sufficient to establish 'unreasonable' interference with railroad operations."  *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 335 (5th Cir. 2008).  But the Agreement's requirement to maintain employees in Palestine necessarily requires Union Pacific to provide facilities there. And Union Pacific presents evidence that maintaining its Palestine facilities disrupts the railroad's operations, undermines the company's business objective to maximize efficiency, and requires an enormous financial outlay in the coming years.  Docket No. 39, Ex. 11 at 1 ¶ 3; Ex. 4 at 85:1–86:6; Ex. 14 at 1 ¶ 3.  Defendants introduce no evidence to the contrary.  The Court thus finds that the 1954 Agreement unreasonably burdens and interferes with Union Pacific's railroad facilities.

Defendants also argue that finding preemption here would mean that the ICCTA impliedly preempts "any lease, easement or other agreement requiring an allocation of resources."  Docket No. 51 at 17.  But the implied preemption analysis turns on the *reasonableness* of the burden.  Here, Union Pacific has conclusively

demonstrated that the *perpetual* 1954 Agreement, formed in a regulatory context no longer in place, is unreasonable.   Indeed, under Texas law, "contracts which contemplate continuing performance (or successive performances) and which are indefinite in duration can be terminated at the will of either party." *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 842 (Tex. 2010) (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 841 (Tex. 2000)); *see also Trient Partners I Ltd. v. Blockbuster Entm't Corp.*, 83 F.3d 704, 709 (5th Cir. 1996) (emphasis original) ("We will not hold that a contract is definite in duration when it (1) expressly states that it will 'continue indefinitely,' *and* (2) is confined in time only by 'termination provisions' which contain conditions that are likely never to transpire.").   The 1954 Agreement contemplates continuous and inescapable performance.   Its terms constitute economic regulation and unreasonably burden Union Pacific's railroad-transportation operations and facilities.   And its formation was subject to a level of state and federal regulation that is no longer permissible under the ICCTA.   *See* H.R. Rep. No. 80-3711 at 1 (2007) (supporting repeal of the 1889 Shop Act because it was an "obsolete statute[] regulating railroads" and "preempted by federal law"); 2007 Tex. Sess. Law Serv. ch. 1115, § 5(2).

As Union Pacific notes, the relevant question is not whether a given regulation is "survivable" but whether it is unreasonable.   Docket No. 48 at 10.   Perpetual maintenance of the inefficient Palestine facilities, a direct consequence of the 1954 Agreement, is unreasonable.   Absent any evidence to the contrary, the Court finds

the Agreement unreasonably burdens rail transportation and is thereby impliedly preempted by the ICCTA.  *See Franks*, 593 F.3d at 414.

### E. THE VOLUNTARY CONTRACT EXCEPTION

The City and County also argue that the 1954 Agreement is a voluntary contract that cannot be preempted by a federal statute.  Docket No. 51 at 18–19.  Union Pacific counters that the Agreement is "not a true contract" but a regulatory act deriving its power from Texas statutes.  Docket No. 39 at 20–22.  As explained below, the Court holds that the voluntary contract exception does not apply here.

The voluntary contract exception prevents railroads from using the ICCTA to "shield the carrier from its own commitments."  *Twp. of Woodbridge v. Consol. Rail Corp.*, 2001 WL 283507 at *2 (S.T.B. Mar. 22, 2001).  The Fourth Circuit explained further:  "Voluntary agreements between private parties [] are not presumptively regulatory acts," and thus most private contracts are not "the sort of 'regulation' expressly preempted by [the ICCTA]."  *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 218–19 (4th Cir. 2009).  Voluntary agreements, moreover, are unlikely to be impliedly preempted because they generally reflect "the carrier's own determination and admission that the agreements would not unreasonably interfere with interstate commerce."  *Id.* at 221 (quoting *Twp. of Woodbridge*, 2001 WL 283507 at *3).  Applying this reasoning, the Fourth Circuit held in *PCS Phosphate* that an agreement requiring a railroad to pay for the relocation of a rail line servicing a mine was not preempted by the ICCTA.  The agreement—between the railroad and mine owner—"is not the sort of rail 'regulation' contemplated by the statute and, as a voluntary agreement, does not 'unreasonably interfere with rail transportation.'"  *Id.*

32

at 214; s*ee also Pejepscot Indus. Park, Inc. v. Maine Cent. R.R. Co.*, 297 F. Supp. 2d 326, 333 (D. Me. 2003) ("[A] rail carrier that voluntarily enters into an otherwise valid and enforceable agreement cannot use the preemptive effect of section 10501(b) to shield it from its own commitments, provided that the agreement does not unreasonably interfere with interstate commerce."); *Traction Tire, LLC v. Total Quality Logistics, LLC.*, No. 19- CV-5150, 2020 WL 6044179, at *8 (E.D. Pa. Oct. 13, 2020) ("[B]ecause Plaintiff's claims are for breach of contract, the provisions of the ICCTA . . . do not preempt these claims against Defendant.").

As Union Pacific argues, however, the 1954 Agreement is not a voluntary contract between private parties.  The Agreement is with the City and County—both acting in their roles as government entities to secure benefits for their citizens, not as market participants.  *See Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 768-70 (4th Cir. 2018) ("[W]hen the state acts as a market participant, it is treated like a private party in the same market; when the state acts as a regulator, it is subject to the unique limits placed on states by our federal system.").  And the 1954 Agreement was not voluntary, but rather the product of a federal bankruptcy proceeding in which state and federal law constrained the railroad's negotiating power.  Docket Nos. 39 at 6–8 ¶¶ 7–10; 51 at 3 ¶ 3.  Recall that Union Pacific's predecessor, MoPac, sought to merge with I&GN in the 1950s and close the facilities in Palestine as part of a reorganization, but the bankruptcy court advised that MoPac "secure a modification of the 1914 decree so that the planned unification could be complete."  *City of Palestine*, 559 F.2d at 412; 11 U.S.C. § 205(n); Docket Nos. 39 at 7 ¶ 10; 51 at 3 ¶ 3.

The resulting 1954 Agreement thus differs from the voluntary agreements in *PCS Phosphate* and the other cases cited by Defendants.  *See* 559 F.3d at 214; Docket No. 51 at 18–19.   Rather than negotiating freely and "enter[ing] into efficient arrangements" as the railroad did in *PCS Phosphate*, *id*. at 221, MoPac was forced to choose between the 1954 Agreement and a financially unsustainable path that led the parties to bankruptcy court.   The 1954 Agreement, moreover, does not impose typical contractual obligations on Union Pacific, but instead perpetuates state "Shop Acts" that have long been repealed.   TEX. REV. CIV. STAT. arts. 6275, 6277 (1926) (regulating the location of Texas-chartered railroads' general offices, machine shops, and roundhouses); 2007 Tex. Sess. Law Serv. ch. 1115, § 5(2) (repealing the office and shop laws).   Nor does the 1954 Agreement provide a typical remedy in the case of breach.   It instead entitles the City and County to reinstate the original—and more onerous—1914 Decree if Union Pacific breaches.   Docket No. 39, Ex. 1 at 9–10.   The 1954 Agreement thus looks and feels more like the kind of state "regulation" the ICCTA expressly preempts.   *See* TEX. REV. CIV. STAT. arts. 6275, 6277; *Friberg*, 267 F.3d at 443–44 (holding state cause of action expressly preempted).

In any event, the changed circumstances since 1954 demonstrate that, to the extent the Agreement was voluntary, it nonetheless unreasonably interferes with rail transportation today.   To be sure, "contracts that were freely negotiated between sophisticated business parties should not be easily set aside, as they reflect a market calculation that the benefits of the agreement outweigh the costs."  *CSX Transp., Inc. v. City of Sebree*, 924 F.3d 276, 286 (6th Cir. 2019) (quotations omitted).   But a once-

34

voluntary contract may nevertheless unreasonably interfere with rail transportation where "circumstances have materially changed since the agreement was voluntarily entered into by its predecessor." *Id*. For example, the Sixth Circuit held in *CSX Transportation* that the ICCTA impliedly preempted a fifteen-year-old contract that was executed when train loads were lighter, trains were slower, and rails were "jointed," not "welded." *See id*. So too here. Union Pacific has presented evidence that the circumstances here have materially changed since the 1954 Agreement was executed, including the passage of the ICCTA, the decline of coal-related revenues, the inefficiencies of the Palestine facilities, and the cost for necessary repairs, among others. Pub. L. No. 104-88, 109 Stat. 803 (1995); Docket No. 39, Ex. 4 at 80:2–5, 105:7–14; Ex. 11 at 1 ¶ 3; Ex. 14 at 1 ¶¶ 2–3.

While it may often be appropriate to require "the performance of obligations under contracts voluntarily negotiated by the parties' predecessors in interest," that is not the case here, where requiring performance would perpetuate a repealed regulatory structure. *See PCS Phosphate Co. v. Norfolk S. Corp.*, 520 F. Supp. 2d 705, 716 (E.D.N.C. 2007), *aff'd*, 559 F.3d 212 (4th Cir. 2009). Indeed, if this kind of contract were permitted, the ICCTA would be virtually without effect as state and local governments could simply force railroads to enter into agreements as substitutes for the local regulations the ICCTA displaced. *See* Surface Transportation Board, 60 Fed. Reg. 14849 (April 3, 1996).

## F. DEFENDANTS' AFFIRMATIVE DEFENSES

In their Amended Answer to Union Pacific's Complaint, the City and County raise six affirmative defenses: laches, equitable estoppel, ratification, subject matter

jurisdiction, res judicata, and the Contract Clause.  Docket No. 24 at 8–12 ¶¶ 43–50.

A plaintiff may move for summary judgment to "test a defense's sufficiency."  10B

CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE

§ 2734 (4th ed. 2020).  Union Pacific moves for summary judgment on all six defenses,

arguing that Defendants cannot establish them as a matter of law.  Docket No. 39

at 4, 22, 30.[10]  For the reasons discussed below, the Court agrees.

### 1. Laches

Union Pacific argues that the laches defense fails because the City and County

have not shown "undue prejudice."  Docket No. 39 at 22.  Defendants identify their

prejudice as stale evidence.  Docket No. 51 at 20.  Viewing the facts in the light most

favorable to Defendants, the Court concludes that the laches defense fails as a matter

of law.

The affirmative defense of laches has three elements:  "(1) a delay on the part

of the plaintiff in instituting suit; (2) that is not excused; and (3) that results in undue

prejudice to the defendant's ability to present an adequate defense."  *Nat'l Ass'n of

Gov't Emps. v. City Pub. Serv. Bd. of San Antonio*, 40 F.3d 698, 708 (5th Cir. 1994).

The City and County assert that Union Pacific's inexcusable delay in challenging the

1954 Agreement unduly prejudices them because the evidence "regarding any

unreasonable interference based on the 1954 Agreement" is unavailable.  Docket

---

[10]  Union Pacific further argues that Defendants' equitable defenses—laches, equitable estoppel, and
ratification—are "concepts from state private law" that should not override federal policy.  Docket
No. 39 at 28.  The Court declines to address this issue and instead holds that the defenses fail as a
matter of law as explained in the text above.

No. 51 at 20.   They cite the deposition testimony of Union Pacific's corporate representative, Cynthia Sanborn, who testified that she was unable to identify how the 1954 Agreement affected Union Pacific's operations since passage of the ICCTA and repeal of the Texas Shop Act.  Docket No. 51, Ex. 1 at 91:18–24, 92:3–8.

Sanborn's inability to answer these narrow questions does not create a disadvantage for Defendants "in asserting and establishing a claimed right or defense." *Nat'l Ass'n of Gov't Employees*, 40 F.3d at 710 (quoting *In re Bohart*, 743 F.2d 313, 327 (5th Cir. 1984)).   The relevant question for purposes of analyzing implied preemption is whether the 1954 Agreement *currently* unduly burdens rail transportation—not if-and-how it has burdened rail transportation in the past.  *See Franks*, 593 F.3d at 414.  Accordingly, the City and County have failed to show undue prejudice, and the laches defense is unavailable as a matter of law.

## 2. Equitable Estoppel

Union Pacific argues that Defendants cannot establish the elements of the equitable estoppel defense because they have not shown that Union Pacific made a false representation on which they detrimentally relied.  Docket No. 39 at 26–27. Defendants cite a newspaper article in which a Union Pacific spokesperson was reported to have said that "the company would continue to meet contractual obligations."  Docket No. 51, Ex. 11 at 41 ¶7.

Under Texas law, equitable estoppel requires a five-part showing, with the first being a "false representation or concealment of material facts." *Med. Care Am., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 341 F.3d 415, 422 (5th Cir. 2003) (quoting *Johnson & Higgins v. Kenneco Energy*, 962 S.W.2d 507, 515–16 (Tex. 1998)).   The

Court finds no evidence of a false representation.  The alleged statement in the newspaper article is impermissible hearsay.  *See James v. Tex. Collin Cnty.*, 535 F.3d 365, 374 (5th Cir. 2008) ("Newspaper articles, however, are not proper summary judgment evidence to prove the truth of the facts that they report because they are inadmissible hearsay.").  Further, the spokesperson's full quote makes clear that she was not promising continued compliance, but rather that Union Pacific "remains in compliance."  Docket No. 51, Ex. 11 at 41 ¶7.  With no evidence of a false statement, Defendants' affirmative defense of equitable estoppel fails as a matter of law.

### 3. Ratification

Union Pacific contends that Defendants' ratification defense fails because the 1954 Agreement is void as preempted and cannot be ratified.  Docket No. 39 at 27–29.  Defendants argue that the contract was *voidable* and capable of ratification.  Docket No. 51 at 22–24.  As discussed above, the Court has determined that the ICCTA preempts the 1954 Agreement.  Where "the requirements of the law are not met, the contract is void."  *United States v. Walker*, No. 1:11-CR-67, 2011 WL 6181468, at *2 (E.D. Tex. Dec. 13, 2011).  "Promises that are void cannot be ratified." *Wamsley v. Champlin Refining & Chems., Inc.*, 11 F.3d 534, 538 (5th Cir. 1993) (citing RESTATEMENT (SECOND) OF CONTRACTS § 7 cmt. a.); *accord id*.  Defendants' ratification argument thus fails as a matter of law.

### 4. Subject Matter Jurisdiction

The Court rejected Defendants' jurisdiction argument above in Part II.B. Docket No. 24 at 8 ¶ 43.  Further, lack of subject matter jurisdiction is not an

affirmative defense.  *See, e.g.*, *SEC v. BIH Corp.*, No. 2:10-CV-577-FTM-29, 2013 WL 1212769, at *6 (M.D. Fla. Mar. 25, 2013).

### 5. Res Judicata

Union Pacific argues that Defendants' res judicata defense—based on the Fifth Circuit's decision in *City of Palestine*, 559 F.2d at 415—fails as a matter of law because both the laws and facts have materially changed since that opinion issued. Docket No. 39 at 29.   Defendants contend that *City of Palestine* conclusively determined that the 1954 Agreement is a voluntary contract.  Docket No. 51 at 24–25.

Res judicata has four elements, but only the fourth element is at issue here: whether *City of Palestine* and the instant suit involve "the same claim or cause of action." *Hous. Prof'l Towing Ass'n v. Hous.*, 812 F.3d 443, 447 (5th Cir. 2016) (quoting *Comer v. Murphy Oil USA, Inc.*, 718 F.3d 460, 466–67 (5th Cir. 2013)).  A claim is the same when it has "the same nucleus of operative facts." *Id.* (quoting *United States v. Davenport*, 484 F.3d 321, 326 (5th Cir. 2007)).  The Fifth Circuit recognizes that changes of law and fact may preclude res judicata's application when those changes are "significant." *Id.* at 449.

Both the law and facts have significantly changed here.  At the time of *City of Palestine*, the governing law was the Interstate Commerce Act (ICA). *See* 559 F.2d at 413.  But in 1995, the ICCTA repealed and replaced the ICA, diminishing state regulatory power. *See Friberg*, 267 F.3d at 443.  And the facts giving rise to Union Pacific's preemption claim have likewise changed, including significant differences in the market for rail transportation, inefficiencies in the Palestine facilities, and the

39

costs of repair.  Docket No. 39, Ex. 4 at 80:2–5, 105:7–14; Ex. 11 at 1 ¶ 3; Ex. 14 at 1 ¶¶ 2–3.   Complying with the 1954 Agreement is thus more burdensome today than it was when *City of Palestine* was decided, and Defendants have failed to show otherwise.

### 6. Contract Clause

Union Pacific argues that the Contract Clause is inapplicable because it applies only to the states and the ICCTA is a federal statute.  Docket No. 39 at 30. Defendants do not respond to this argument.

The Contract Clause of the U.S. Constitution provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1. Because the ICCTA was enacted by Congress, not a State, the Contract Clause does not apply here.  *See Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 n.9 (1984) ("It could not justifiably be claimed that the Contract Clause applies, either by its own terms or by convincing historical evidence, to actions of the National Government. . . the Framers explicitly refused to subject federal legislation impairing private contracts to the literal requirements of the Contract Clause[.]").

### IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The City and County also move for summary judgment, arguing that the ICCTA does not preempt the 1954 Agreement as a matter of law because the Agreement was voluntary and, in any event, the ICCTA does not expressly or impliedly preempt the Agreement.  Docket No. 42 at 10.  Defendants' motion presents the same undisputed facts regarding the formation of the 1954 Agreement, Docket No. 42 at 6–10, along with the same arguments discussed above regarding Union

Pacific's motion, *id*. at 12–22.  For the reasons stated above, the Court holds that the voluntary contract exception does not apply here and the ICCTA expressly preempts, and alternatively impliedly preempts, the 1954 Agreement.  As a result, the Court **DENIES** the City and County's Motion for Summary Judgment (Docket No. 42).

## V. EVIDENTIARY MOTIONS AND OBJECTIONS

Union Pacific has filed several evidentiary objections and motions, including: Objections to Defendant's Summary Judgment Evidence (Docket No. 48, Ex. 1), Opposed Motion to Exclude Defendants' Expert Daniel Elliott (Docket No. 38), and Motion for Leave to File Supplemental Summary Judgment Evidence (Docket No. 53).  In deciding the Motions for Summary Judgment addressed above, the Court did not rely on any of these disputed materials.  The Court nevertheless addresses each in turn.

### A. PLAINTIFF'S OBJECTIONS TO DEFENDANT'S SUMMARY JUDGMENT EVIDENCE

Union Pacific objects to three exhibits introduced as evidence in the City and County's Motion for Summary Judgment.  Docket No. 48, Ex. 1.[11]

First, Union Pacific objects to Daniel Elliott's testimony (Docket No. 42, Ex. 3). Docket No. 48, Ex. 1 at 1.  The objection duplicates Plaintiff's Opposed Motion to Exclude Defendants' Expert, Daniel Elliott (Docket No. 38).  Having resolved the motion in Union Pacific's favor, *infra* Part V.B, the Court overrules as moot this first objection.

---

[11] Defendants objected to some of Union Pacific's summary judgment evidence.  The Court addressed those objections *supra* note 7.

Second, Union Pacific objects to certain statements in Palestine Mayor Steven Presley's affidavit (Docket No. 42, Ex. 10).  Docket No. 48, Ex. 1 at 1–2.  Union Pacific argues that descriptions of nineteenth-century events constitute impermissible hearsay because Mayor Presley has no personal knowledge of the events.  *Id.*  The City and County argue that these statements are admissible under the historical document exception to hearsay.  Docket No. 57 at 2–3.  The City and County misread the exception.  Under the Federal Rules of Evidence, a party may admit a "statement in a document that was prepared before January 1, 1998, and whose authenticity is established."  FED. R. EVID. 803(16).  No such document is before the Court.  *See* Docket No. 42, Ex. 10.  Mayor Presley's testimony takes the form of an *affidavit*, not an *ancient document*.  Accordingly, the Court sustains Union Pacific's objection to Mayor Presley's testimony on historical events.

Finally, Union Pacific objects to a statement in Judge Robert Johnston's affidavit (Docket No. 42, Ex. 11).  Docket No. 48, Ex. 1 at 2.  Union Pacific argues that Judge Johnston has no personal knowledge that "Union Pacific has accepted the benefits of the assets and operations that it assumed by its acquisition of MoPac in 1997."  *Id.* (quoting Docket No. 42, Ex. 11 at 2).  The City and County argue that this fact is generally known by all persons in Palestine and does not require "personal knowledge of Union Pacific's operations."  Docket No. 57 at 3.  The Court disagrees.  The phrase "accepted the benefits of the assets and operations" suggests an understanding of Union Pacific's corporate affairs.  Judge Johnston does not assert

42

any qualification to testify on such affairs.  Accordingly, the Court sustains Union Pacific's objection to Judge Johnston's testimony on the matter.

### B. PLAINTIFF'S OPPOSED MOTION TO EXCLUDE DEFENDANTS' EXPERT DANIEL ELLIOTT

Union Pacific moves to exclude Daniel Elliott's expert report, arguing that Mr. Elliott's testimony impermissibly consists of legal analysis.  Docket No. 38 at 3–5.  The City and County, however, do not rely on this testimony in their summary judgment motion or in their opposition to Union Pacific's motion.  The Court thus **DENIES** this motion as moot.  *Morris v. Trans Union LLC*, 420 F. Supp. 2d 733, 741 (S.D. Tex. 2006), *aff'd*, 224 F. App'x 415 (5th Cir. 2007) (granting motion for summary judgment and summarily denying all outstanding motions as moot).

### C. PLAINTIFF'S OPPOSED MOTION FOR LEAVE TO FILE SUPPLEMENTAL SUMMARY JUDGMENT EVIDENCE

Union Pacific identifies two new factual arguments in the City and County's Response to Motion for Summary Judgment (Docket No. 48) and moves to file three exhibits as supplemental summary judgment evidence.  Docket No. 53 at 1–2 ¶¶ 2–5.  The new arguments are factual issues pertaining to (1) Union Pacific's train traffic flow and (2) recent negotiations between the Parties.  Docket No. 53 at 1–2 ¶ 2.  The City and County oppose the motion, arguing that the Response does not raise new arguments.  Docket No. 58 at 1.  Further, the City and County argue that they would suffer prejudice if Exhibit 29 (Declaration from John Turner) is admitted because it includes testimony by a previously undisclosed witness.  *Id.* at 2.  The Court does not rely on any of the three exhibits in granting Union Pacific's Motion for Summary Judgment.  But the Court agrees with Union Pacific: the exhibits are admissible

because they respond to arguments the City and County raised in responsive briefing without prejudicing the City and County.  *See Vais Arms, Inc. v. Vais*, 383 F.3d 287, 292 (5th Cir. 2004).

First, Defendants' Response plainly presents two new factual assertions.  As to the train flow patterns, the Response expressly "disputes the factual allegations contained in paragraph no. 24," arguing that "[r]ail cars come into Palestine for repair from Hearne on the Austin-San Antonio line as well as from Houston."  Docket No. 51 at 6 ¶ 11.  And, as to the Parties' recent negotiations, the Response asserts that "Union Pacific completely fails to address that it recently requested that the County assume permanent maintenance of a road and bridge on Union Pacific property for its benefit." *Id.* at 22.  Both assertions introduce new facts, and the City and County's denials do not persuade the Court otherwise.  Supplemental summary judgment evidence may be filed in response to a new factual assertion.  *E.g.*, *Metzler v. XPO Logistics, Inc.*, No. 4:13-CV-278, 2014 WL 4792984, at *6 (E.D. Tex. Sept. 25, 2014). So, the City and County's first argument to exclude fails.

Second, admitting Exhibit 29 (Declaration from John Turner) would not prejudice the City and County.  Prejudice may arise when a party does not have an adequate opportunity to respond to the new evidence.  *See Vais Arms*, 383 F.3d at 292.  But here, the City and County had seven days to file a sur-reply.  *See* Local Rule 7-f.  While the City and County had not previously deposed Mr. Turner, they did depose Union Pacific's now-departed corporate representative, Cynthia Sanborn, for whom Mr. Turner was a substitute.  Docket No. 62 at 2.  The City and County do not

identify any deficiencies in their deposition of Cynthia Sanborn, nor do they request the opportunity to depose Mr. Turner.  Accordingly, the Court finds no prejudice, and the City and County's second argument fails.

Although the Court does not rely on this evidence to dispose of Union Pacific's Motion for Summary Judgment, the Court nevertheless finds that Union Pacific is entitled to have these exhibits admitted.

## VI. CONCLUSION

To summarize and based on the foregoing, the Court hereby **DENIES** Defendants' Motion to Dismiss Under Rule 12(b)(7) (Docket No. 40); **DENIES** Defendants' Motion to Dismiss Under Rule 12(c) (Docket No. 41); **GRANTS** Plaintiff's Motion for Summary Judgment (Docket No. 39); **DENIES** Defendants' Motion for Summary Judgment (Docket No. 42); **DENIES AS MOOT** Plaintiff's Motion to Exclude Defendants' Expert (Docket No. 38); and **GRANTS** Plaintiff's Motion for Leave to File Supplemental Summary Judgment Evidence (Docket No. 53).

So **ORDERED** and **SIGNED** this **3rd**  day of **February, 2021.**

JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE